**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2552-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LASHAWN SHERMAN,

     Defendant-Appellant.

_____

> Argued May 18, 2022 – Decided June 27, 2022
>
> Before Judges Hoffman, Whipple and Geiger.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 18-11-1556.
>
> Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Zachary G. Markarian, of counsel and on the brief).
>
> Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury found defendant Lashawn Sherman guilty of eleven offenses. He appeals his convictions, challenging the admissibility of certain law enforcement testimony and the jury instruction on flight. Defendant also appeals his seventeen-year aggregate sentence, claiming the court erred by double-counting two of his prior convictions as both predicate offenses for imposing a mandatory extended range sentence and as an aggravating factor in setting the length of that term. We affirm in part, vacate in part, and remand for resentencing on count nine.

I.

A Middlesex County grand jury issued an indictment charging defendant with third-degree possession of a controlled dangerous substance (CDS) (heroin), N.J.S.A. 2C:35-10(a)(1) (counts one and eight); third-degree distribution of CDS (heroin), N.J.S.A. 2C:35-5(a)(1) and (b)(3) (count two); third-degree distribution of CDS (heroin) within 1000 feet of school property, N.J.S.A. 2C:35-7(a) (count three); second-degree distribution of CDS (heroin) within 500 feet of a public park, N.J.S.A. 2C:35-7.1(a) (count four); third-degree possession of CDS (heroin) with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and

2

-5(b)(3) (count five); third-degree possession of CDS (cocaine) with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7(a) (counts six and ten); third-degree possession of CDS (heroin) with intent to distribute within 1000 feet of school property, N.J.S.A. 2C:35-7.1(a) (count seven); second-degree possession of CDS (cocaine) with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3) (count nine); fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2) (count eleven); and third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a) (count twelve). Count thirteen only charged codefendant Richard Chambers.[1]

Defendant filed a motion to suppress evidence seized during the search of defendant's person and vehicle following a surveillance operation. During the suppression motion hearing, police officer testimony provided the following version of the incident.

On the morning of September 11, 2018, Detective Joshua Alexander of the New Brunswick Police Department (NBPD) Narcotics Intel Unit was conducting surveillance of Seaman Street between Remsen Avenue and Throop

---

[1] Codefendant Chambers pled guilty to third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1) and was sentenced to probation. He is not a party to this appeal.

Avenue. Alexander had been a member of the NBPD for twelve years, had participated in "thousands of [narcotics] investigations" and was "familiar with [the] area around Seaman, Remsen and Throop." Alexander testified that "Seaman Street [was] where a lot of narcotic sales are done," and the NBPD had received numerous complaints from citizens that "numerous individuals were selling quantities of narcotics" there. He stated that "a lot of people who come into town know" they can purchase "any type of street level narcotics" in this area.

While conducting surveillance, Alexander "had a very good view" of defendant, who was wearing a grey hooded sweatshirt, a black knit hat, and light-colored jeans while sitting on the front steps of a house on Seaman Street. Alexander saw an older white male, later identified as Chambers, approach defendant wearing a dark color hooded sweatshirt. Defendant conversed with Chambers and then Chambers handed him "some money." Alexander specifically testified that "a narcotics transaction happened where [defendant] reached down the front of his pants," took out "small packages" that were "about the size of a postage stamp" and handed them to Chambers who put the packages in his pants and walked away.

4

Alexander radioed his team and directed them to pursue Chambers. Detective Jeffrey Monticello stopped Chambers about "a block and a half away" and explained to him what Alexander witnessed. Monticello "gave [Chambers] the opportunity to be forthcoming" and Chambers reached into his waistband and pulled out ten decks of heroin, each stamped "Mayweather" in green ink.[2] Monticello informed the other officers that Chambers possessed heroin. As a result, Officer Michael Powers drove an unmarked police car toward defendant to arrest him. Powers was wearing plain clothes and had his badge "prominently displayed" around his neck.

Before Powers "could even get out of [his] vehicle," defendant "immediately took off running." Powers "immediately identified [himself] as a police officer" and yelled loudly at defendant to stop. Defendant did not stop running, but Powers caught up to him and placed him under arrest. Defendant was searched incident to arrest and Monticello recovered heroin with the same "Mayweather" stamp and $592 in various denominations from defendant's pockets.

---

[2] "'Decks' of heroin refer to the 'little glassine packets' that contain 'the powdery substance.'" State v. McNeil-Thomas, 238 N.J. 256, 263 n.1 (2019) (quoting State v. Morrison, 188 N.J. 2, 5 (2006)).

Defendant was transported to the police station where an additional six packets of heroin were found during a strip search. Detectives also found a key fob in his pocket which led detectives to a Volvo about a block away from Throop and Seaman Streets. The car was towed to the NBPD sally port and after obtaining a warrant to search it, Monticello found a "plastic bag containing 323 packets of crack cocaine" in the center console. Fifty packets of heroin, $1,812 in cash, and two motor vehicle summonses issued to defendant were found in the glove compartment.

The court found the State satisfied its burden of proof that the officer's observations justified the stop, arrest, and subsequent searches. The court denied the motion to suppress in an oral decision and an accompanying order.

A jury trial was held over a three-day period in October 2019. Tiffany Meeks of the New Jersey State Police Laboratory testified that she tested the drugs found on defendant and Chambers and in defendant's vehicle. She confirmed that one of the ten glassines found on Chambers and one of the fifty glassines found in defendant's car tested positive for heroin. She also tested twenty-nine of the 323 samples found in the center console of defendant's car and confirmed they tested positive for cocaine. The total weight contained in the 323 bags was 37.75 grams. James Meehan of the State Office of Forensic

6

Scientists analyzed one of the six glassines found on defendant and confirmed it tested positive for heroin.

Agent Daniel Muntone of the Middlesex County Prosecutor's Office testified as the State's expert in the field of street-level narcotics possession and distribution. His work as an agent followed a twenty-seven-year career in law enforcement. Muntone explained that heroin was commonly packaged and sold in wax folds that are stamped with a brand, typically containing 0.02 to 0.03 grams, and costing about five to ten dollars each. Ten of these bags were referred to as a "bundle."

Muntone explained that a drug user, as opposed to a dealer, would buy, and ingest, only "one to two bags of heroin" at a time. He added that drug users are typically in possession of drug paraphernalia such as needles, cut straws, and spoons. In contrast, when heroin is possessed with an intent to distribute, wax folds in large quantities, scales, stamps, and rubber bands could be found.

Muntone additionally testified regarding crack cocaine. He explained that a typical user buys one or two rocks costing about ten dollars. Crack users typically possess pipes, and a distributor would usually have baggies to package it and cash in various denominations.

A-2552-19

Muntone made it clear that "every case stands on its own" and various factors such as the amount of a drug, the packaging, and the paraphernalia found, are all considered when determining whether someone's possession is for personal use or distribution.

On appeal, defendant challenges Detective Alexander's testimony about what he witnessed on the date of defendant's arrest. The relevant sections of his testimony are outlined below.

> Prosecutor: And what happened as you observed this individual wearing that sweatshirt, the hat, and the jeans?
>
> Detective Alexander: He was sitting on . . . the front steps of 134 Seaman Street. There was several other people in the area. While he was sitting there, he was approached by another male, older white male, who was wearing like a dark color sweatshirt or hoodie. After a brief conversation, a narcotics transaction happened where Mr. Sherman reached down in front of his pants. After-- after the gentleman who came up with a Mr. Chambers. Mr. Chambers handed Mr. Sherman some money. Mr. Sherman took the money, reached down the front of his pants, pulled out what I believed to be-
>
> Defense Counsel: I'm going to object.
>
> The Court: Grounds?
>
> Defense Counsel: As -- as to unduly prejudicial, lack of foundation. It's undetermined at that time what, if anything, the object was.

8

. . . .

> The Court: I'm going to -- I'm going to allow it. I expect there to be a . . . foundation to be laid after.

The direct questioning by the prosecutor continued:

> Prosecutor: So -- so, Detective, can -- can you describe specifically what you observed, without speculating as to -- as to what it was?
>
> Detective Alexander: Mr. Sherman reached down in front of his pants –
>
> Prosecutor: Uh-huh.
>
> Detective Alexander: -- removed small packages, which are about the size of a postage stamp, and gave a -- a quantity to Mr. Chambers. Mr. Chambers then put that down in front of his pants and walked out of the area.
>
> Prosecutor: And after you observed this, what did you believe had just occurred?
>
> Detective Alexander: I believed that there was a narcotics transaction right there.

The second contested portion of testimony occurred as follows. The prosecutor projected a map of the area onto a wall in the courtroom and asked Alexander to "indicate with the laser pointer where [on the map he] observed what [he] believed to be at the time a narcotics sale?" Alexander pointed to an area of the map and responded, "Right around here." Next, the prosecutor asked

9

Alexander to indicate with the laser pointer "where the white male went after the narcotics transaction," referring to Chambers. Alexander stated the man "walked down to Remsen Avenue. He made the turn off Remsen, going towards Handy Street, and once he made this turn here, [Alexander] couldn't see him anymore."

The prosecutor continued using the map which led to the third portion of testimony that defendant argues on appeal was unduly prejudicial.

> Prosecutor: Now, Officer, just looking at this map, and you might have to get up, can you see where the Lord Stirling School is on the map?
>
> Detective Alexander: Yes.
>
> Prosecutor: And can you point to it, just so the jury sees it too?
>
> Detective Alexander: Lord Stirling School is right here. It's -- it's within these grey surface areas.
>
> Prosecutor: Now, Detective, with this red pen, can you just make just an X right where you observed what you believed to be the hand-to-hand transaction?
>
> Detective Alexander: Right. So this is Remsen Avenue right here. There's Handy. There's Seaman. The transaction -- this is -- this is (inaudible). This is Throop here. So, I was right around here. There's the (inaudible) over here on (inaudible) Street, around here.

A-2552-19

Defense counsel only objected to the first section of this testimony now being challenged on appeal. The objection was based solely on the testimony being "unduly prejudicial, lack[ing] of foundation" and "undetermined at that time what, if anything, the object was."

In addition, defendant argues on appeal that the court erred by presenting inappropriate jury instructions that confused the issues of resisting arrest by flight and flight as proof of consciousness of guilt. The flight instructions had been discussed earlier at the charge conference, where the court, defense counsel, and the prosecutor considered the difference between the offense of resisting arrest by flight and the jury charge permitting the jury to consider flight as an adverse inference. The prosecutor requested a charge on flight as consciousness of guilt, however the court ruled that it would not provide that charge because it would result in "double-counting" flight as both a distinct charge and as proof of consciousness of guilt for all charges. As a result, the instructions charged the jury as to resisting arrest by flight and did not address flight as consciousness of guilt.

Later during jury deliberations, the jury inquired about a question on the verdict sheet that related to the resisting arrest by flight charge. The jury requested a "definition of flight or act of flight." The court and counsel then

11

searched for a definition in the Model Criminal Jury Charges. The prosecutor noted, "I think that was our problem last week was that the model jury instructions didn't actually have a . . . definition of flight." The court responded that maybe it could use the definition for flight contained in the model jury charge for flight as consciousness of guilt.

The court and the prosecutor then discussed the appropriate portions which should be read to the jury, and throughout, defense counsel did not participate or make any grievances known. The court asked defense counsel if he had "any opinion" to which he responded he did not. In response to the jury's question, the court gave the following instruction to the jury:

> [Y]ou recall that there was some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the offense -- of the crime.
>
> The question of whether the defendant fled after the commission of the crime is another question of fact for your determination. Mere departure from a place where a crime has been committed does not constitute flight. If you find that the defendant, fearing that an accusation or arrest would be made against him on the charge involved in the indictment, took refuge in flight for the purpose of evading the accusation or arrest on that charge, then you may consider such flight in connection with all the other evidence in the case as an indication of proof of consciousness of guilt.

A-2552-19

Flight may only be considered as evidence of consciousness of guilt if you should determine that the defendant's purpose in leaving was to evade accusation or arrest for the offense charged in the indictment.

If after consideration of all the evidence you find that the defendant fearing that an accusation or arrest would be made against him on the charge involved in the indictment took refuge and flight for the purpose of evading the accusation or arrest, then you may consider such flight in connection with all the other evidence in the case as an indication of proof or proof of consciousness of guilt.

It is for you as judges of the facts to decide whether or not evidence of flight shows a consciousness of guilt and the weight to be given such evidence in light of all the other evidence in the case.

The jury found defendant guilty of all twelve counts pertaining to him. The State moved pursuant to N.J.S.A. 2C:43-6(f) for a mandatory extended term on count nine based on defendant's prior convictions.

Defendant acknowledged that he was mandatory extended term eligible on count nine. Defense counsel requested that all terms run concurrently, and that the court impose a twelve-year term with a four-year period of parole ineligibility for the mandatory extended term on count nine. Noting that the extended sentencing range on count nine was five to twenty years, the State argued for a fourteen-year term with seven years of parole ineligibility on count

13

nine, and a consecutive three-year term on count twelve, yielding a seventeen-year aggregate term.

The court noted defendant was thirty years old and recounted his prior juvenile and adult record, which began in 2006 and included an unsuccessful prior stint in Recovery Court. The court recounted defendant's violations of probation as a juvenile and his violation of probation and parole as an adult. The court gave great weight to aggravating factors three (risk of reoffending); six (prior record); and nine (need for deterrence). N.J.S.A. 2C:44-1(a)(3), (6), and (9). The judge found no mitigating factors and was clearly convinced that the aggravating factors substantially outweighed the non-existent mitigating factors.

After appropriate mergers, the court sentenced defendant to four concurrent terms that yielded an aggregate seventeen-year term, subject to seven years of parole ineligibility. Specifically, on counts four and seven, defendant was sentenced to seven-year terms with three years of parole ineligibility. The court granted the State's application to sentence defendant to a mandatory extended term on count nine pursuant to N.J.S.A. 2C:43-6(f), and sentenced defendant to a fourteen-year term with seven years of parole ineligibility. On count eleven, defendant received an eighteen-month term. On count twelve,

14

defendant received a three-year term running consecutively to count nine.  This appeal followed.

Defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT VIOLATED [DEFENDANT'S] RIGHT TO A FAIR TRIAL BY ALLOWING THE POLICE DETECTIVE TO TESTIFY THAT HE OBSERVED [DEFENDANT] MAKE A NARCOTICS SALE.

POINT II

DETECTIVE ALEXANDER'S TESTIMONY THAT THE AREA WAS KNOWN FOR "A LOT OF NARCOTIC SALES" WAS IRRELEVANT AND PREJUDICIAL. (Not raised below).

POINT III

IN RESPONSE TO A JURY QUESTION REGARDING THE CHARGE OF RESISTING ARREST BY FLIGHT, THE COURT IMPROPERLY INSTRUCTED THE JURY FOR THE FIRST TIME THAT IT COULD CONSIDER FLIGHT AS PROOF OF CONSCIOUSNESS OF GUILT FOR ALL CHARGES. (Not raised below).

POINT IV

THE COURT ERRED IN FINDING AND WEIGHING AGGRAVATING FACTORS BY DOUBLE-COUNTING THE CONVICTIONS THAT MADE SHERMAN EXTENDED-TERM ELIGIBLE IN AGGRAVATION AND CONSIDERING

15

"CONTACTS" FOR WHICH SHERMAN WAS NOT CONVICTED. (Not raised below).

In a pro se supplemental brief, defendant raises the following points:

POINT I

[DEFENDANT] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN COUNSEL'S FAILURE TO CHALLENGE THE SEIZURE AND PRE-WARRANT IMPOUNDMENT OF HIS VEHICLE.

(a) The Administrative Impoundment of Defendant's Vehicle was Invalid as a Matter of Law.

POINT II

THE PROSECUTOR COMMITTED MISCONDUCT IN FAILING TO DISCLOSE THE IMPEACHMENT EVIDENCE TARGETING ITS MOST CRUCIAL TRIAL WITNESS, IN VIOLATION OF THE UNITED STATE'S SUPREME COURT DECISION IN BRADY V. MARYLAND, 373 U.S. 83 (1963).

II.

An error is harmful if it is "clearly capable of producing an unjust result." The harmful error rule is used when a specified error was brought to the trial judge's attention. State v. G.E.P., 243 N.J. 362, 389 (2020). Harmless error is not a ground for reversal. That is so because

> [t]rials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial

can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness. "A defendant is entitled to a fair trial but not a perfect one."

[State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).]

As with "plain error," an error during a jury trial will be found "harmless" unless there is a reasonable doubt that the error contributed to the verdict by leading the jury "to a result it otherwise might not have reached." State v. Daniels, 182 N.J. 80, 95 (2004) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Defense counsel did not object to the high crime area testimony or the jury instructions. Consequently, those arguments are subject to review for plain error. See State v. Singh, 245 N.J. 1, 13 (2021) (noting that when a party does not object to an alleged trial error or otherwise properly preserve the issue for appeal, it may nonetheless be considered by the appellate court if it meets the plain error standard of Rule 2:10-2.) Reversal is appropriate only if the error was "clearly capable of producing an unjust result." R. 2:10-2. The error must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]" State v. Taffaro, 195 N.J. 442, 454 (2008); accord State v. Dunbrack, 245 N.J. 531, 544 (2021).

17

## III.

Applying these standards of review, we first address whether defendant was denied a fair trial because of Detective Alexander's testimony. Defendant argues that Detective Alexander was permitted to testify "repeatedly, over defense objection, to his belief that he saw [defendant] make a 'narcotics transaction." Defense counsel objected once during this line of questioning. Defendant argues such testimony violates case law limiting the State's presentation of lay opinion from a police officer, particularly State v. McLean, 205 N.J. 438 (2011). Defendant states that McLean "plainly prohibited" Alexander's testimony because he did not "confine his testimony to his own observations" and testified as to what he believed he witnessed.

N.J.R.E. 701 permits a non-expert witness to offer "testimony in the form of opinions" but "only . . . if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." McLean, 205 N.J. at 456. "[U]nlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460 (citing N.J.R.E. 703).

18

In McLean, our Supreme Court announced certain restrictions on the ability of prosecutors to present lay opinion testimony from police officers who have not been proffered by the State as expert witnesses. Id. at 460-63. The McLean Court specifically considered testimony given by a police officer who participated in an investigation that led to the defendant's prosecution for possession of CDS and possession with intent to distribute. Id. at 443-47. There the officer testified that he observed the defendant engage in two transactions. Id. at 443-44. Over defense counsel's objection, the prosecutor asked the officer: "So based on your own experience sir, and your own training, what did you believe happened at that time?" Id. at 446. The trial court permitted the officer, as a lay witness, to testify that he believed he had observed a drug transaction. Ibid. On appeal, the Court held that the police officer's statement was inadmissible because it was an expression of a belief in the defendant's guilt, and because it offered an opinion on matters that were not beyond the understanding of the jury. Id. at 463; see also N.J.R.E. 701. The Court further noted that admissible fact testimony by a police officer cannot express what the officer "believed," "thought," or "suspected." Id. at 460.

Here, the State acknowledges that the prosecution erred in presenting testimony from Alexander giving his lay opinion that the activities he witnessed

19

appeared to be a drug transaction. This acknowledged error does not automatically mandate reversal of defendant's conviction and a new trial. "When evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict." State v. Weaver, 219 N.J. 131, 154 (2014) (citing Chapman v. California, 386 U.S. 18, 24 (1965)). "The standard has been phrased as requiring a reviewing court 'to declare a belief that [the error] was harmless beyond a reasonable doubt.'" Ibid. (alteration in original) (quoting Chapman, 386 U.S. at 24).

In addition, defendant's only objection to the testimony was that the testimony was "unduly prejudicial" and "lack[ed] foundation" because it was "undetermined at that time what, if anything, the object was." Defense counsel did not cite or specifically articulate a violation of the lay opinion rule discussed at length in McLean. Accordingly, we review for plain error.[3]

---

[3] See State v. Covil, 240 N.J. 448, 472 n.6 (2020) ("At trial, defendant objected to 'the characterization' in the expert witness's testimony, but did not cite N.J.R.E. 404(b) or [State v. Cofield,127 N.J. 328 (1992)], and accordingly this Court reviews the trial court's decision for plain error."); see also State v. Tung, 460 N.J. Super. 75, 100 (App. Div. 2019) ("Defense counsel did not object to any other statements by [the detective] touching on defendant's guilt or veracity. Although partially raised, we review this issue under the plain error standard as well.").

A-2552-19

Defendant has the burden of showing that impermissible lay opinion testimony was "clearly capable of producing an unjust result." R. 2:10-2. Defendant has not met that burden. We conclude the error was harmless in light of the strength of the State's other proofs. Defense counsel did not contest that a narcotics transaction took place but only stated that police "charged the wrong person with distribution of narcotics." Defense counsel tried to raise doubt and implicate others to no avail. The jury rejected that defense.

Defendant contends this testimony violated McLean and invaded the province of the jury. Our careful review of the record convinces us the error did not impact the verdict and was harmless beyond a reasonable doubt. There is little to suggest that the error led the jury to a result it otherwise might not have reached. The evidence against defendant was overwhelming. A substantial amount of heroin and cocaine was found in defendant's car. Additional CDS was found on his person. Heroin with a matching stamp was found on Chambers shortly after Alexander saw him exchange currency with defendant and receive items that appeared to be CDS. Large amounts of cash were found in defendant's pockets and inside his vehicle.

IV.

Defendant next argues that Detective Alexander's testimony violated N.J.R.E. 403 and 404(b) because he testified that "a lot of narcotics sales" occur in the area where defendant was apprehended and implicitly suggested that his presence there suggested bad character and a propensity to sell drugs. During trial, Alexander was asked by the prosecutor if he was "familiar with this area" and the detective replied in the affirmative and explained:

> Seaman Street is where a lot of narcotic sales are done, street levels sales. A lot of people who come into town know that if you need any type of narcotics, . . . the places you come is Remsen, Seamen Street . . . .
>
>     . . . .
>
> If you go from Seaman Street -- the whole of Seaman Street from Paul Robeson, all the way down to . . . Drift Street, you could pretty much find any type of narcotics you want. Our main narcotic sale areas for street level where out-of-towners come is the area of Seaman and Remsen, Seaman and Throop, Seaman and Lee, and then once you cross over Livingston, there is a couple of houses that are well known by locals, as well as out-of-towners that this is the area to come to buy -- you know, any type of street level narcotics that you need.

Because the defense did not object when this testimony was presented, we review for plain error. R. 2:10–2. Defendant's argument rests on an alleged violation of N.J.R.E. 404(b) and analogizes the facts to those in State v. Herbert,

22

where a police officer testified that the homicide occurred in a "gang area" and that the defendant was a gang member. 457 N.J. Super. 490, 499 (App. Div. 2019). In Herbert, we held that the testimony violated N.J.R.E. 404(b) because it "conveyed the taint of criminality and propensity to commit crimes." Ibid.

Under N.J.R.E. 401, relevant evidence is proof "having a tendency to prove or disprove any fact of consequence to the determination of the action." Here, the testimony that the neighborhood was a high-narcotics area was based on the officer's personal observations, twelve years of experience, including participation in numerous narcotics investigations, and surveillance of that area. His testimony was relevant to provide background and context to explain his presence at that location.

Under N.J.R.E. 403(a), relevant "evidence claimed to be unduly prejudicial can be excluded only where its probative value 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the basic issues of the case." State v. Covell, 157 N.J. 554, 568 (1999) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). Whether such evidence is admissible is a decision within the trial judge's broad discretion. Id. at 568-69.

A-2552-19

Defendant relies on a line of out-of-state cases as support for his contention that police testimony about a "high crime area" or "high narcotics area" was unduly prejudicial or constituted inadmissible propensity evidence. We are unpersuaded. "[A]n officer's testimony, when relevant, about whether a neighborhood is a 'high crime area'" is permissible lay testimony. McLean, 205 N.J. at 459 (citing Trentacost v. Brussel, 164 N.J. Super. 9, 19-20 (App. Div. 1978) (police officer who investigated more that seventy-five crimes in a neighborhood over a three-year period may offer his opinion that the neighborhood was a high crime area), aff'd, 82 N.J. 214 (1980)); see also State v. Hyman, 451 N.J. Super. 429, 442 (2017) (same). This principal applies with equal force to an officer's lay opinion based on personal observation and knowledge that the location of the crime was a "high narcotics area." Testimony that a location is a "high narcotics area" was not directly probative of whether defendant himself engaged in any criminal activity but explained to the jury why the officer was conducting surveillance in the area.

Defendant's reliance on N.J.R.E. 404(b) is misplaced. Rule 404(b) does not forbid the testimony elicited from Alexander. Defendant did not object to the instances when the prosecution had Alexander use a laser pointer on a map of the area. This testimony provided context to why Alexander and his team

24

were surveilling the area. The testimony was based on Alexander's personal experience with narcotics investigations in the area. A foundation was laid that Alexander had personal knowledge of the sale of narcotics around Seaman Street and streets that intersected it, because of his extensive personal experience investigating narcotics trafficking in that area. Those investigations and the related surveillance revealed the area experienced high levels of narcotics sales. Alexander's lay opinion was "rationally based on [his] perception" and assisted the jury in understanding his testimony by providing context. N.J.R.E. 701; see State v. Labrutto, 114 N.J. 187, 197-98 (1989) (explaining that it is well-established that lay witnesses may offer an opinion on "matters of common knowledge and observation"). By so testifying, Alexander did not invade the province of the jury.

Moreover, the challenged testimony was accompanied by other relevant, admissible evidence that demonstrated defendant possessed CDS with the intent to distribute it, and sold CDS to Chambers. We discern no plain error.

V.

When defendant was approached by police on the date of his arrest, he took off running and had to be caught and wrestled to the ground. Defendant argues the court gave an inappropriate jury instruction that confused the

concepts of resisting arrest by flight and flight as consciousness of guilt. Defendant argues the court's improper instruction to the jury allowed them to consider flight as proof of consciousness of guilt for all charges and was not responsive to their question concerning the definition of flight. This issue was not objected to below and is therefore reviewed for plain error.

When reviewing a jury instruction, "[t]he test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997) (alteration in original) (quoting State v. Sette, 259 N.J. Super. 156, 190-91 (App. Div. 1992)). A jury "charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005). Moreover, the effect of any error must be considered "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Plain error, in the context of an allegedly improper jury charge, "requires demonstration of legal impropriety of the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Ibid. (quoting State v. Burns, 192 N.J. 312, 341 (2007)).

26

We note that "evidence of flight or escape from custody by an accused generally is admissible as demonstrating consciousness of guilt, and is therefore regarded as probative of guilt." State v. Mann, 132 N.J. 410, 418 (1993). Flight from the scene of a crime, if carried out with the purpose of avoiding apprehension, prosecution, or arrest, is generally admissible to draw an inference of guilt. Id. at 418-19. If the trial court deems evidence of flight admissible, "it must instruct the jury carefully regarding the inferences the jury may draw from that evidence." Id. at 420. In doing so, the court must "carefully consider whether it is appropriate to charge flight, and, if so, must tailor the charge to the facts of the case to prevent juror confusion." State v. Randolph, 441 N.J. Super. 533, 563-64 (App. Div. 2015).

Here, the uncontroverted evidence showed that defendant fled the scene, left his car unattended, ignored commands by police to stop, and had to be chased and brought to the ground to arrest him. While the court had earlier indicated that it was not going to instruct the jury on flight as evidence of consciousness of guilt, in searching for a definition of flight, it essentially did exactly that.

The court properly exercised its discretion in using the flight charge to define flight to the jury. The State presented evidence that the plain-clothes

27

police officer wearing a badge "prominently" around his neck approached defendant soon after his narcotics sale to Chambers. Defendant saw the officer and immediately took off running. We also find the purported error to be harmless. The court provided the model jury charge on flight as evidence of consciousness of guilt. Despite the court's prior decision not to give that charge because it was somehow "double counting," the instruction was appropriate given the facts in this case. Moreover, defendant did not object to the instruction and did not ask for a curative instruction. We discern no plain error.

## VI.

In his supplemental brief, defendant argues that he was denied effective assistance of counsel due to trial counsel's failure to challenge the seizure and the pre-warrant impoundment of his vehicle. We decline to address defendant's ineffective assistance counsel argument on direct appeal as that claim is better suited to consideration in a post-conviction relief proceeding. See State v. Preciose, 129 N.J. 451, 460 (1992) ("Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record."). Defendant may raise his ineffective assistance of counsel claims in a timely filed petition for post-conviction relief under Rule 3:22.

Defendant also argues that the State possessed exculpatory material which should have been turned over to him in discovery pursuant to Brady v. Maryland, 373 U.S. 83 (1963).  He notes that the State did not call Chambers, the alleged buyer, as a witness.  Defendant claims that "[i]n the absence of information regarding the Detective's lack of candor, defendant had nothing to go on as far as attacking his credibility."  Defendant could have called Chambers as his witness.  He elected not to do so.  Defendant was not barred from calling Chambers as a witness because he was listed on the State's witness list.

Defendant's claim that the State possessed evidence which it did not turn over to the defense is belied by the record and lacks sufficient merit to warrant much discussion in a written opinion.  R. 2:11-3(e)(2).  Defense counsel signed a discovery receipt for the materials that defendant claims he did not receive in discovery.  Those materials included thirty-two pages of documents, a CD-R, two DVD-Rs, and a DVD+R DL.  Defendant has not demonstrated that the State failed to provide exculpatory evidence.  We discern no Brady violation, much less plain error.

## VII.

Defendant argues the court erred in sentencing him to an extended term because of alleged double counting.  We review defendant's sentence for abuse

of discretion. State v. Pierce, 188 N.J. 155, 166 (2006). We will affirm a sentence

> unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

The sentencing court must examine the aggravating and mitigating factors enumerated in N.J.S.A. 2C:44-1(a) and (b). Each factor found by the court must be relevant and supported by "competent, reasonably credible evidence." Id. at 72 (quoting Roth, 95 N.J. at 363). The court then must conduct a qualitative balancing of the factors to determine the appropriate sentence. Id. at 72-73.

Defendant argues the court erred by double-counting defendant's prior drug convictions as both a basis for a mandatory extended term and in support of applying statutory aggravating factors used to determine the length of his prison terms. Defendant does not dispute that the court correctly imposed a mandatory extended term on count nine pursuant to N.J.S.A. 2C:43-6(f), based on his two prior convictions for distribution of CDS in a school zone.

The court found defendant had a lengthy criminal record which dated back to 2006. He incurred five delinquency adjudications as a juvenile, including two violations of probation and one violation of intensive supervision, six municipal court convictions, four indictable convictions, and five violations of parole. The judge also noted that defendant had received the benefit of Recovery Court and multiple probationary terms, which he repeatedly violated, and regularly committed new crimes soon after he was released from prison.

The judge gave great weight to aggravating factor three because "clearly any sentence imposed on the defendant has done nothing to dissuade him from criminal activity[.]" The judge also gave great weight to aggravating factors six and nine based on his prior record, the seriousness of the offenses for which he was convicted, and because none of the probationary sentences or terms of incarceration had any effect on him. The judge did not find any mitigating factors and was clearly convinced that the aggravating factors substantially outweighed the non-existent mitigating factors.

Judges must "avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense," such as "[e]lements of a crime, including those that establish its grade." State v. Lawless, 214 N.J. 594, 608 (2013). However, a judge does not impermissibly double count when they

consider a defendant's prior criminal history for multiple aggravating and mitigating factors. State v. Tillery, 238 N.J. 293, 328 (2019). Thus, a judge is not "required to ignore the extent of [a defendant's] criminal history when considering applicable aggravating factors." State v. McDuffie, 450 N.J. Super. 554, 577 (App. Div. 2017). Judges may also consider a defendant's "uninterrupted history of criminality" in their determination of whether aggravating factor six is applicable. State v. Dalziel, 182 N.J. 494, 502 (2005). Judges may also consider a defendant's juvenile and municipal court records. State v. Taylor, 226 N.J. Super. 441, 453-54 (App. Div. 1988).

Defendant claims the court impermissibly double-counted his criminal record when it considered two prior convictions as both a predicate offense for purposes of the persistent offender extended term statute, N.J.S.A. 2C:44-3(a), and as a basis for finding an aggravating factor under N.J.S.A. 2C:44-1(a). We agree that such double-counting is impermissible. State v. Vasquez, 374 N.J. Super. 252, 267 (App. Div. 2005). In Vasquez, we determined the sentencing judge erred in "rais[ing] the presumptive extended base term on account of defendant's only prior conviction, the very conviction which both allowed and required an extended term." Ibid. We concluded doing so was a form of impermissible double-counting. Ibid. A sentencing court should not use the

A-2552-19

same prior conviction as a predicate offense under N.J.S.A. 2C:44-3(a), and to determine the appropriate length of the term within the extended range.

On the other hand, a sentencing court is permitted to consider a defendant's other prior convictions when applying and weighing aggravating factor six. Unlike in Vasquez, defendant's two predicate convictions for distribution of CDS in a school zone were not his only prior indictable convictions. In May 2009, defendant was convicted of fourth-degree unlawful taking of a motor vehicle, N.J.S.A. 2C:20-10(b). In June 2009, defendant was convicted of third-degree receiving stolen property, N.J.S.A. 2C:20-7. The court properly considered defendant's prior joyriding and receiving stolen property convictions in setting the length of the term imposed on count nine. To that extent, the court did not impermissibly double-count.

The court properly considered defendant's extensive juvenile record, which included four adjudications of juvenile delinquency, two violations of probation, and violation of intensive supervised release. The court likewise properly considered defendant's extensive municipal court record, which included six convictions.

In addition, all of defendant's prior convictions, including the two predicate offenses, were properly considered in applying and weighing

aggravating factor six in setting the length of the terms and any period of parole ineligibility on counts four, seven, eleven, and twelve.

Substantial credible evidence in the record amply supports the application of aggravating factors three, six, and nine and the finding that the aggravating factors substantially outweighed the non-existent mitigating factors on counts four, seven, eleven, and twelve. We discern no basis to disturb defendant's sentence on those counts.

We reach a different result as to count nine. The court considered defendant's four prior indictable convictions when imposing a fourteen-year term with seven years of parole ineligibility. This presumably impacted the length of the term and period of parole ineligibility defendant received. Because the court improperly considered the two predicate offense convictions, we vacate the sentence on count nine and remand for resentencing on that count. On remand, the court shall not consider defendant's 2011 and 2012 convictions of possession of CDS in a school zone when setting the length of the term and any period of parole ineligibility. In so ruling, we express no opinion on the appropriate length of the sentence on count nine.

Affirmed in part, vacated in part, and remanded for resentencing on count nine. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2552-19